NACIREMA OPERATING COMPANY, Inc.

and

Travelers Insurance Company

v.

Stephen O'HEARNE, Deputy Commissioner Fourth Compensation District

and

Wade Moragne EL, Jr.

No. 4174.

United States District Court
D. Maryland.

May 15, 1963.

Joseph H. Young, Piper & Marbury, Baltimore, Md., for libellants.

Bernard M. Goldstein, Baltimore, Md., for claimant.

Joseph D. Tydings, U. S. Atty., and Daniel F. McMullen, Jr., Asst. U. S. Atty., Baltimore, Md., for Stephen O'Hearne, Deputy Commissioner.

R. DORSEY WATKINS, District Judge.

This is a proceeding brought by the employer of a longshoreman and by the employer's insurance carrier under 33 U.S.C.A. § 921 to review a compensation order.

Claimant sustained an injury to his left knee on November 6, 1957, resulting in laxity of the medial collateral and anterior cruciate ligaments and mild generalized traumatic arthritis, while working as a longshoreman for Nacirema Operating Company, Inc. (Nacirema). The employer and insurance carrier made voluntary payments of compensation to the claimant, without an award, at the maximum rate from November 7, 1957 to October 27, 1959 inclusive. Following a hearing on March 2, 1960, the Deputy Commissioner found that the claimant had been wholly disabled from the date of the accident through October 27, 1959 and "that as the further result of the injury sustained the claimant has permanent partial disability equal to 50% of such disability as he would have if he had lost his entire left leg." Compensation for such permanent partial disability was awarded on the basis of 50% of the scheduled period for the loss of a leg, 33 U.S.C.A. § 908(c) (2), and a formal award was made to claimant for temporary total disability from November 7, 1957 to October 27, 1959, inclusive.

The employer and its insurance carrier seek review on the grounds that the findings of the Deputy Commissioner are arbitrary, contrary to the weight of the evidence in the case, not supported by substantial evidence and not in accordance with the law. The scope of review in a case of this type is well settled. The findings of the Deputy Commissioner are to be accepted unless they are unsupported by substantial evidence on the record considered as a whole. (O'Leary v. Brown-Pacific-Maxon, 1951, 340 U.S. 504, 508, 71 S.Ct. 470, 95 L.Ed. 483; Ennis v. O'Hearne, 4 Cir., 1955, 223 F. 2d 755; Varney v. O'Hearne, D.C.D.Md. 1956, 141 F.Supp. 421; Brown v. O'Hearne, D.C.D.Md.1958, 160 F.Supp. 517; Miller v. O'Hearne, D.C.D.Md.1960, 181 F.Supp. 105). Furthermore, any logical inference or deduction drawn from the evidence by the Deputy Commissioner must be taken as a fact and cannot be reviewed. (O'Leary v. Brown-Pacific-Maxon, 1951, 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483; Cardillo v. Liberty Mutual Insurance Co., 1947, 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028. Ennis v. O'Hearne, 4 Cir., 223 F.2d 755, 758; Miller v. O'Hearne, D.C.D.Md.1960, 181 F.Supp. 105, 106). The findings here to be reviewed are (1) the period of time during which claimant was totally disabled and (2) the extent of his permanent partial disability.

Claimant testified at the hearing before the Deputy Commissioner that he had sustained a prior injury to his left knee on May 28, 1952 while working on a pier as a longshoreman for Bull Lines Steamship Company. He was treated by Dr. George Eaton and thereafter returned to work as a longshoreman, performing his duties fully and regularly without difficulty. On February 8, 1954, he took employment with the Baltimore City Fire Department as a fire fighter

after passing a thorough physical examination which included the condition of his legs. He worked steadily and did not sustain any further injury to his left knee or left leg. His duties as a fire fighter included "throwing up" ladders, climbing ladders, hauling hose, fire plugging and hooking hose onto ladders. In handling three lines of a hose from a pumper a fireman must brace his legs against the rungs of the ladder in order to prevent being thrown off in the event that a line buckles. Claimant, being right-handed, had to brace himself on the left side. He was able to perform all the duties required of him as an active fire fighter including the scaling of walls and at no time experienced any difficulty with his left knee or left leg. He voluntarily resigned from the fire department on May 8, 1957 for personal reasons. Claimant's testimony regarding his ability to perform the arduous duties of a fire fighter was confirmed in all respects by a witness from the Fire Department Headquarters Company. Claimant resumed work as a longshoreman sometime prior to August 1957 and was reinstated in the Union as a longshoreman. He worked regularly and steadily, performing satisfactorily all of the duties of a longshoreman until the accident on November 6, 1957.

On that date while working for complainant, Nacirema, he was removing the beams from the No. 4 hatch when a beam hook slipped and struck him on the left knee. The hook was a solid piece of steel about seven or eight inches long, three-quarters of an inch wide and about three-quarters of an inch thick. His knee swelled and he reported the injury to the timekeeper. His employer furnished him with medical care the next day. X-rays were taken and treatment given by drawing fluid from the knee joint with needles. He was referred to Dr. John T. H. Johnson who treated him during the period from January 21, 1958 to October 7, 1959. The doctor operated on claimant's knee on September 3, 1958, inserting a screw about an inch and a half above the joint. The imbedded screw will remain indefinitely in the leg. Claimant was in a cast from September 3, 1958 to October 13, 1958. He has experienced since the accident of November 6, 1957 and continues to experience constant and severe pain up and down the inner side of his leg, constant pain underneath the knee cap, swelling after being on his feet for any length of time, a sensation of numbness in his left leg, weakness in the leg and a complete inability to perform the duties required of a longshoreman. He is not "eligible" [1] to handle cargoes of pipe because he cannot move fast enough should an emergency arise. His leg does not permit him even to handle bag freight cargo. The relatively light work on the waterfront of driving a fork-lift tractor if continued for as short a period of time as three or four hours causes his leg to swell.

In the latter part of 1958 or the early part of 1959, at the suggestion of Dr. Johnson that he seek lighter work, claimant began actively looking for employment other than as a longshoreman. At that time plaintiff was approximately thirty-five years old and had, in addition to a High School education, completed two years of college at Morgan State College, Baltimore, Maryland. Claimant filed applications for clerical positions with the State of Maryland and with the City of Baltimore. He applied to the Civil Service Commission in Philadelphia, Pennsylvania for employment as a postal transportation clerk and as a substitute clerk carrier. His suitability for employment was questioned and after investigation his name was restored to the register of eligibles on October 13, 1959. Had there at any time been any opening claimant would have accepted any such employment offered him. Although he has not been refused employment at any of the places where he has applied because of the difficulty he has had and continues to have with his knee, he has not been successful in obtaining employment. Beginning in September of 1959, for

---

1. Claimant's testimony; transcript, page 30.

about a month, claimant was employed on a part-time basis doing "odds and ends", burning trash, washing cars, scrubbing floors and waxing and buffing floors. He has contacted complainant Nacirema frequently but each time was told there was no work for him, not even the relatively physically easy job of driving a fork-lift tractor. Indeed, from his own testimony it is doubtful that he would be capable of doing such work. In January of 1960 when he obtained several days work on the waterfront he found that he was not physically able to work longer than four to five hours and that after working that length of time he had to rest for one or two days before attempting to work again. Claimant was discharged from Dr. Johnson's care on October 7, 1959, because, according to claimant's testimony, the insurance carrier, The Traveler's Insurance Company (Traveler's), wanted to rate him.

The various opinions of the doctors who testified were based largely upon objective findings and where substantially in agreement as to diagnosis, suggested further treatment, and prognosis. However, when asked specifically the percentage of disability suffered by the claimant, a judgment requiring the evaluation of such factors as "violent" [2] instability and pain, there was a divergence of opinion.

Claimant was examined on January 20, 1960 by Dr. Edward F. Wenzlaff, who testified that x-rays disclosed that claimant's knee presented a picture typical of osteochondritis dissecans with torn ligaments and persistent disability of the knee joint with effusion. The doctor thought that claimant had suffered a fifty per cent permanent partial disability in the left knee joint as a result of the injury. His only suggestion for future treatment was for claimant to continue practicing progressive resistant exercises in an effort to develop further the quadriceps muscle group in the left thigh. Prognosis was given as poor.

A second examining physician, Dr. I. A. Maseritz, saw claimant on February 6, 1960. The history which he took indicated that claimant had undergone an operation by Dr. George Eaton because of an injury to his left knee in May of 1952 and that a second operation was performed by Dr. J. T. H. Johnson because of injury suffered in November of 1957. The physical examination showed moderately severe swelling of the left knee, part of which was actual thickening of the tissues. Comparative measurements of claimant's legs revealed a quadriceps atrophy in the left thigh. There was instability of the left knee and flexion had to be forced, indicating tightness within the joint proper which was a painful condition. X-rays indicated osteochondritis dissecans. The doctor stated that the joint "looked bad" and that in his opinion claimant had a disability of about fifty per cent in the use of his left knee due to its instability. The doctor rechecked the claimant two or three days after his first examination before formulating his final opinion which was that the instability in the claimant's knee was permanent, that the prognosis was grave, that no improvement would result from any further operation and that it was highly probable that the knee would become worse.

A report of Dr. Chester J. Semel, Sr., dated June 6, 1958 gave his impression of claimant's condition as osteochondritis dissecans and unstable knee joint with abnormality of the medial collateral ligament and cruciate ligaments. The claimant was rated as having a thirty-five per cent disability of the left lower extremity. At that time surgery was recommended on the ground that it might reduce the disability somewhat. Claimant was again examined by Dr. Chester J. Semel, Sr. after Dr. Johnson had operated and Dr. Semel again rated the claimant's disability as thirty-five per cent of the left lower extremity, commenting that the prognosis was somewhat guarded with a good possibility for progres-

2. Dr. Johnson's characterization; transcript, page 94.

sive degenerative changes of the left knee joint.

Dr. John T. H. Johnson, the treating physician, was called as a witness for the employer and insurance carrier. When he first examined the claimant on January 21, 1958, his impression was that the claimant had an unstable left knee with laxity of the medial collateral and anterior cruciate ligaments and mild generalized traumatic arthritis resulting in a twenty-five per cent permanent disability of his left knee. He at that time recommended that claimant should attempt to find a lighter line of work. He next examined the claimant on April 16, 1958 and reaffirmed his original rating of claimant's disability, adding that the knee would not hold up very long if claimant attempted to resume work as a longshoreman. He again advised that claimant seek other work. In July, 1958 Dr. Johnson found claimant's condition unchanged in that he had an unstable knee "with considerable disability". He was not fit for heavy work and was given the choice of trying light work or having an operation which would produce at best about fifty per cent improvement of the knee but probably would still not enable him to do heavy work. The recommended operation was subsequently performed on September 3, 1958. In February of 1959, about five months after the operation, Dr. Johnson noted that claimant had a twenty-five per cent disability of the knee; that no further treatment was indicated; and that claimant had reached "about maximum improvement" and was able to do light work at any time. The doctor still felt that claimant had a twenty-five per cent permanent disability of the left knee in October 1959, when claimant was discharged from his care.

In summary, Dr. Johnson believed that claimant should have been gainfully employed "a good bit of the time" after the operation of September 3, 1958, although not as a longshoreman. In July of 1958, Dr. Johnson discussed the possibility of the operation, which was subsequently performed, with the claimant. He point-

ed out the possibilities and made them as grim as he could. He did not highly recommend the operation and left the decision with the claimant. He merely suggested the operation because it had been six months since he had first seen the claimant and the claimant had still not obtained any light work. Dr. Johnson stated "We were all getting sort of desperate as to what to do with this man, and I merely put out the possibility." It was Dr. Johnson's definite opinion that claimant could not do, and would never be able to do, longshoreman's work.

 There is substantial evidence to sustain the finding of the Deputy Commissioner that the claimant sustained permanent partial disability equal to fifty per cent of such disability as he would have sustained if he had lost his entire left leg. Evidence which is substantial is "the kind of evidence a reasonable mind might accept * * * to support a conclusion" (John W. McGrath Corp. v. Hughes, 2 Cir., 1961, 289 F.2d 403, 405). The record discloses nothing to indicate that this finding was arbitrary, contrary to the weight of evidence, or not in accordance with the law.

 The medical testimony outlined above concerned the condition of claimant's knee and the opinions expressed by the doctors as to the percentage of permanent disability suffered by the claimant were stated, except for Dr. Semel's reports, in terms of percentage of permanent disability to his knee. The Deputy Commissioner, on the other hand, rated claimant's permanent disability in terms of percentage of loss of an entire leg. There is authority for rating a disability to a knee in terms of loss of, or loss of use of, a leg. (Booth v. Monahan, D.C.D.Me.1930, 56 F.2d 168). By way of analogy it might be noted that compensation for the loss of two or more digits of a hand or foot may be proportioned to the loss of use of the hand or foot involved (33 U.S.C.A. § 908c(17); Luckenbach S.S. Co., Inc. v. Norton, D.C.E.D.Pa.1938, 23 F.Supp. 829) and compensation for an arm or a leg, if amputated at or above the elbow

or the knee shall be the same as for the loss of the arm or leg; but, if amputated between the elbow and the wrist or the knee and the ankle shall be the same as for loss of a hand or foot. (33 U.S.C.A. § 908c(15)).

The Longshoremen's and Harbor Workers' Compensation Act specifically provides: "Compensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of the member." (33 U.S.C.A. § 908c(19)). Where a statute provides compensation for both the loss of a member and for the loss of the use of the member the "view has been taken that the term 'loss,' in the schedule of fixed compensation, has reference, not to the impairment of the usefulness of a member, but to its actual physical severance." (58 Am.Jur., Workmen's Compensation, § 287). No physical severance is involved in the instant case. It would have been more precise for the Deputy Commissioner to have rated claimant's disability in terms of loss of use but the court does not consider such nicety of language of controlling significance. Accordingly, for the purposes of this proceeding, the court will treat the Deputy Commissioner's rating in terms of percentage of loss of an entire leg as meaning or being synonymous with loss of use of an entire leg.

The testimony of Dr. Wenzlaff[3], as well as that of Dr. Johnson[4] indicates that the ratings given by them in terms of percentage of disability of the claimant's knee should be translated into exactly the same rating for the percentage of disability of claimant's leg. Logically this is so because the doctors' evaluation of disability is given in medical terms and is measured by physical functional condition alone. The Deputy Commissioner, on the other hand, uses no fixed formula to translate a percentage of disability in a knee into a percentage of loss of use of a leg. His finding in this regard depends upon the circumstances of each particular case, including such factors as the claimant's age, education, mentality, industrial history and the availability of the type of work which claimant can do. In a case closely on point where medical testimony was given in terms of disability to a knee while compensation was awarded on the basis of percentage of loss of use of a leg, the court stated:

"* * * it is clear that there was evidence to sustain the opinion of the Deputy Commissioner that claimant had sustained an impairment of the usefulness of his right leg estimated by the Deputy Commissioner as 60 per cent. To be sure, none of the medical witnesses used that figure in describing the impairment; in fact, where any figures were used by the medical witnesses, they were not over 40 per cent.; but, the fixing of the percentage was for the Commissioner after

---

**3.** "I might bring out I rated on the knee, Dr. Semel rated him on the lower extremity. He gave him 35 percent disability of the lower extremity; I rated him on the knee.
 "Q. What difference would you draw from that? Would not a disability of the knee be by the same token a disability of the lower extremity?
 "A. To be sure.
 "Q. I mean, I am wondering if this is not really a question of semantics here.
 "A. I'm sure it is."
 (Testimony of Dr. Wenzlaff; transcript, pages 73–74).

**4.** "Do you use any particular formula in relating to any clinical findings of facilities and disability?

"Witness: Insofar as possible, I try to use that AMA formula which they put out. But that really only works when you are working with limitations of motion and objective things.
 "There is nothing that will tell us what to put down for violent instability, pain. So most of it is just your best judgment.
 "The Deputy Commissioner: But it's mostly based upon the anatomical condition, the functional findings, when you examine the man as to what use a man can put his legs—
 "Witness: No, I'm not doing it on the industrial basis. I'm doing it on the percentage of use of the leg, so to speak.
 (Testimony of Dr. Johnson; transcript, page 94).

hearing the opinions of the doctors. He was not limited to 10 per cent. as one doctor described it, or to 40 per cent. as it appeared to another doctor, where other medical testimony described the extent of the disability very definitely in relation to the work the claimant had to do and his activities in earning a livelihood." (Booth v. Monahan, D.C. D.Maine, 1930, 56 F.2d 168, 168–169).

Where one of the doctors in the Booth case having testified that claimant's knee was probably thirty-five or forty per cent impaired for any sort of work, the court commented:

"The plaintiffs regard this testimony as limiting the impairment to 35 or 40 per cent., but I should say that the Deputy Commissioner was justified in regarding this testimony as meaning, in the opinion of the witness, that the claimant was 35 per cent. or 40 per cent. impaired for any sort of work, light or heavy, but totally impaired for heavy work.

"The testimony of the doctor, to whom the patient was referred for 'impartial examination' is to the effect that the permanent partial disability was 10 per cent., but this clearly meant disability for all purposes and not in particular relation to the occupation of the claimant, and I consider that the Deputy Commissioner has the right to fix the disability with reference to the occupation of the claimant as a longshoreman and not as a clerk or office worker for which he may have no capacity whatever. The Deputy Commissioner has a right to disregard the percentage figures given by any of the doctors and to use his own judgment as to the amount of impairment of the claimant's leg considered with reference to his occupation, and that judgment, when based upon evidence such as found here, is conclusive, and cannot be disturbed by this court, even if a judge would come to a different conclusion on the same evidence. It is highly probable that half a dozen persons hearing the same evidence would all have used different figures in describing the percentage of the impairment, which shows the necessity of having the judgment of some one person conclusive; and in these cases the statute has designated the Deputy Commissioner as that person." (Booth v. Monahan, D.C.D. Maine 1930, 56 F.2d 168, 169).

"Scheduled compensation for a specific injury is in the nature of damages or indemnity for the physical or functional loss and is to be awarded even though there is no loss of earning power or wages, and without regard to the extent of the disability suffered." (99 C.J.S. Workmen's Compensation § 306, page 1106). In applying this general principle relative to scheduled injuries to a partial loss of use of a member the extent of disability should be fixed with reference "to the work the claimant had to do and his activities in earning a livelihood." (Booth v. Monahan, D.C.D.Me. 1930, 56 F.2d 168, 169). "A provision for the compensation of the loss of a use of a member as a scheduled injury is to be reasonably construed. 'Loss of use' means useless in any employment for which claimant is mentally and physically fitted." (99 C.J.S. Workmen's Compensation § 314, page 1128). In evaluating the disability to the claimant's leg with reference to his occupation as a longshoreman and with reference to his complete inability to obtain lighter work despite diligent effort on his part, the Deputy Commissioner's finding of the extent of permanent partial disability is unassailable. Even Dr. Johnson, who was called as a witness by the employer and insurance carrier, stated that claimant was not fit for heavy work, that his knee would not hold up if he attempted to resume work as a longshoreman and that claimant had "considerable disability." This testimony coupled with the claimant's own description of his complete inability to perform the duties required of a longshoreman and his lack

of success in obtaining other employment means that all the evidence in the case supports a finding of at least fifty per cent partial permanent disability.

The fact that claimant sustained an injury to his left leg in 1952 did not affect the Deputy Commissioner's finding that claimant's fifty per cent present disability was attributable to the injury of 1957. There is substantial evidence on the record that claimant had fully recovered from the previous accident. That claimant in 1954, more than three and a half years prior to the 1957 injury, had satisfactorily passed a thorough physical examination; had undertaken the arduous duties of an active firefighter, performing satisfactorily for over three years; and had returned to regular and steady employment as a longshoreman is substantial evidence to support a finding that claimant's present disability is due to the 1957 and, by implication, not to the 1952 injury.

Accordingly, the finding of the Deputy Commissioner as to the extent of permanent partial disability is accepted and that portion of his order awarding compensation for such permanent partial disability on the basis of fifty per cent of the scheduled period for the loss of a leg is affirmed.

█ The finding of the Deputy Commissioner that the claimant was wholly disabled from November 7, 1957 to October 27, 1959, inclusive, is unsupported by any evidence on the record. There is evidence that claimant had reached the point of maximum improvement prior to October 27, 1959. He had undergone the only operation suggested for him on September 3, 1958. The cast was removed from his leg on October 13, 1958. Both before the operation and after the operation, Dr. Johnson considered that respondent was capable of working, although not as a longshoreman. The claimant, following Dr. Johnson's suggestion, in the latter part of 1958 or early part of 1959 began applying for employment and expressed a willingness and a readiness to be employed. His applications were acceptable and there is no contention that he was ever refused employment because of his injury. Dr. Semel considered the claimant's condition capable of being rated as a permanent disability when he examined him on March 18, 1959. Dr. Johnson examined the claimant a number of times after the September 1958 operation and rated his disability as a permanent partial disability. In February of 1959 he did not consider further treatment necessary since claimant had reached about maximum improvement and could do light work at any time. Subsequent examinations revealed no change in claimant's condition. Claimant was discharged from Dr. Johnson's care on October 7, 1959.

The record does show a bona fide attempt by claimant to secure employment of a nature for which he might well be assumed to be fitted, taking into consideration his age, education and physical condition. Yet, the claimant has been completely unsuccessful in finding any type of gainful employment.

"Disability is defined in the act as 'incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment'. 33 U.S.C.A. § 902(10). Total disability would seem to exist when there is a complete incapacity to earn wages in the same or any other employment. The use of the words 'in the same or any other employment' presupposes a situation where a man can secure employment. This same construction has been given to the Massachusetts Workmen's Compensation Act in Lacione's Case, 227 Mass. 269, at page 271, 116 N.E. 485, at page 486 where the court said: 'Inability to obtain work resulting directly from his injury would be an "incapacity for work" within the meaning of the workmen's compensation act.' Later, in the same case, it refers to a total inability to perform work, or to secure work to do, as determinative of the employee's right to a

340

total loss of wage-earning ability. The degree of disability in any case cannot be measured by physical condition alone, but there must be taken into consideration the injured man's age, his industrial history, his mentality, his education, and the availability of that type of work which he can do." (Eastern S.S. Lines v. Monahan, 1 Cir., 1940, 110 F.2d 840, 842).

■ Counsel for the Deputy Commissioner contends that in view of the showing that claimant is unable to get any work in his present condition the question may well be whether he is not still totally disabled. The question is not whether claimant is totally disabled, as the Deputy Commissioner has made a finding of permanent partial disability and has been affirmed as to that holding. The court recognizes that the Supreme Court has held, in construing the provisions of the Alaska Workmen's Compensation Act, that a claimant may become entitled to a lump sum payment for total and permanent disability without barring a later award for continuing temporary disability. (Alaska Industrial Board v. Chugach Electric Association, Inc., 1958, 356 U.S. 320, 78 S.Ct. 735, 2 L.Ed.2d 795). In that case, however, no end medical result had been reached and the healing period had not terminated. In the instant case the Deputy Commissioner has held that an end medical result has been reached. The only question is what evidence on the record shows or tends to show that maximum recovery occurred on October 28, 1959, a finding implied in the express finding that claimant was totally disabled from November 7, 1957 to October 27, 1959, inclusive. October 27, 1959 has no ascertainable significance other than being the date on which the compensation payments voluntarily made by the complainants were stopped by them. On the record as it now stands the court can only conclude that the Deputy Commissioner based his finding as to when temporary total disability ceased solely on when voluntary advance payments were stopped. If this is true, his finding is in error as a matter of law. Compensation payments voluntarily made are made without prejudice to the right of the employer and the insurance carrier to controvert the claim thereafter. As stated by Chief Judge Thomsen of this court:

"Policies of various jurisdictions differ as to whether the employer and insurance carrier should be allowed to pay compensation to a claimant without waiting for an award, and without prejudice to their right to controvert the claim after their investigation has been completed.

"The investigation of such a claim often requires that a considerable number of people be interviewed, and that doctors be given sufficient time to examine the claimant, to take x-rays or make other tests, and in some cases to follow the patient over a period of weeks. Some jurisdictions feel that the employer and the insurance carrier should be encouraged to make such voluntary payments without prejudice, so that the employee and his family may receive the money promptly, when they need it most, and unnecessary contests, with resulting delay and expense to the employee, may be avoided. Other jurisdictions feel that voluntary payments without an award should not be made.

"The former policy has been followed for many years by the deputy commissioner in this district, who has held that the voluntary payment of compensation before a claim is filed does not waive the right to controvert the claim." (Oljenik v. O'Hearne, D.C.1955, 135 F.Supp. 496, 497–498).

Accordingly, that portion of the order of the Deputy Commissioner awarding claimant compensation for temporary total disability from November 7, 1957 to October 27, 1959, inclusive, is hereby set aside and the case remanded to the Deputy Commissioner for a specific and

express finding as to when an end medical result was reached; and based upon such finding, a further finding as to when claimant's temporary total disability terminated.